UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMES JONES, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COLUMBIA BANKING SYSTEM, INC. and COLUMBIA BANK,<br><br>Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff James Jones brings this Class Action Complaint, against Defendants Columbia Banking System, Inc. and Columbia Bank (collectively "Defendants"), and each of their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge as to his own actions, the investigation of counsel, and information and belief as to all other matters, alleges as follows:

## INTRODUCTION

1. This action arises out of the public exposure of Plaintiff's and Class Members' Personally Identifying Information[1] ("PII" or "Private Information"), which was

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

in Defendants' possession during a cyberattack between October 2, 2025, and December 22, 2025, caused by Defendants' failure to adequately safeguard that Private Information ("Data Breach").

2. According to Defendants, the Private Information compromised in the Data Breach includes at least names, Social Security numbers, driver's license numbers, and financial account numbers.[2]

3. Defendant Columbia Bank is an FDIC-insured bank which is an "award-winning regional bank serving the western United States… [with] more than 350 locations across Arizona, California, Colorado, Idaho, Nevada, Oregon, Utah, and Washington."[3]

4. Defendant Columbia Bank is a subsidiary of Defendant Columbia Banking System, Inc.[4]

5. Defendants failed to undertake adequate measures to safeguard the Private Information of Plaintiff and the proposed Class Members.

6. Although the Data Breach occurred between October 2, 2025, and December 22, 2025, Defendants failed to immediately notify and warn Plaintiff and Class Members, waiting nearly four months, until April 17, 2026, when Defendants disclosed the Data Breach to the California Attorney General.[5]

7. Upon information and belief, Plaintiff's Private Information is available on the Dark Web as a result of the Data Breach.

---

government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

[2] See sample Notice of Data Breach letter submitted to the California Attorney General, accessible at: https://oag.ca.gov/ecrime/databreach/reports/sb24-621950 (last visited Apr. 27, 2026).

[3] https://www.columbiabank.com/about-us/ (last visited Apr. 27, 2026).

[4] https://www.columbiabankingsystem.com/corporate-profile/default.aspx (last visited Apr. 27, 2026); *see also* https://www.columbiabank.com/about-us/ (last visited Apr. 27, 2026).

[5] https://oag.ca.gov/ecrime/databreach/reports/sb24-621950 (last visited Apr. 27, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

8. As a direct and proximate result of Defendants' failures to protect Plaintiff's and Class Members' sensitive Private Information and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff to seek relief on a class-wide basis.

**PARTIES**

9. Plaintiff is a natural person, resident and citizen of Colorado, where he intends to remain. Plaintiff is a former employee of Defendants, and, upon information and belief, is a Data Breach victim.

10. Defendant Columbia Banking System, Inc. is a Washington corporation organized and existing under the laws of the State of Washington, with its principal place of business located at 1301 A St., Tacoma, Washington 98402.

11. Defendant Columbia Bank is an FDIC-insured bank headquartered at 445 SE Main St., Roseburg, Oregon 97470.

**JURISDICTION & VENUE**

12. This Court has original jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants, and Defendants have different citizenships.

13. This Court has personal jurisdiction over Defendants because Defendant Columbia Banking System, Inc.'s principal place of business is in Washington, and Defendants regularly conduct business and enter into contracts within the State of Washington.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Columbia Banking System, Inc.'s principal place of business is in this District



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

### A. Defendants' Business

15. Defendant Columbia Bank is an FDIC-insured bank which is an "award-winning regional bank serving the western United States… [with] more than 350 locations across Arizona, California, Colorado, Idaho, Nevada, Oregon, Utah, and Washington."[6]

16. Defendant Columbia Bank is a subsidiary of Defendant Columbia Banking System, Inc.[7]

17. Defendants collect and store Plaintiff's and the proposed Class Members' Private Information on their network and systems, and require the submission of the Private Information as a condition for rendering their services.

18. When Defendants collect this Private Information, they promise to use reasonable care to protect and safeguard the Private Information from unauthorized disclosure. Plaintiff and Class Members would not have provided their Private Information to Defendants had they known that Defendants would not employ data security measures sufficient to protect the confidentiality of their Private Information.

19. Defendants maintain privacy policies in which they promise to institute certain data security measures to maintain the confidentiality of individuals' Private Information.[8]

---

[6] https://www.columbiabank.com/about-us/ (last visited Apr. 27, 2026).

[7] https://www.columbiabankingsystem.com/corporate-profile/default.aspx (last visited Apr. 27, 2026); *see also* https://www.columbiabank.com/about-us/ (last visited Apr. 27, 2026).

[8] https://privacy.columbiabank.com/policies?_gl=1*1ro0z8*_gcl_au*MzAyNzU3NjA0LjE3NzcwNDYwOTE.*_ga*MTYzMzkzMTE0MS4xNzc3MDQ2MDky*_ga_8SLPK70MMF*czE3NzcwNDg3NzIkbzIkZzEkdDE3NzcwNDk0MTEkajYwJGwwJGgw (last visited Apr. 27, 2026); *see also* https://privacy.columbiabank.com/policies?name=notice-at-collection-for-california-residents&_gl=1*oaqrky*_gcl_au*MzAyNzU3NjA0LjE3NzcwNDYwOTE.*_ga*MTYzMzkzMTE0MS4xNzc3MDQ2MDky*_ga_8SLPK70MMF*czE3NzcwNTcxMDIkbzMkZzEkdDE3NzcwNTcyMTYkajE4JGwwJGgw (last visited Apr. 27, 2026).



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

20. Despite their alleged commitments to securing sensitive data, Defendants did not follow industry standard practices in securing Plaintiff's and Class Members' Private Information and failed to protect the Private Information of Plaintiff and the proposed Class Members from unauthorized disclosure in the Data Breach.

**B. Defendants Failed to Safeguard Private Information—the Data Breach**

21. Between October 2, 2025, and December 22, 2025, Defendants experienced a cyberattack to their computer information technology systems by an unauthorized threat actor, which resulted in the unauthorized disclosure and exfiltration of Plaintiff's and Class Members' Private Information, including their names, Social Security numbers, driver's license numbers, and financial account numbers.[9]

22. On or around April 17, 2026, Defendants disclosed the Data Breach to the California Attorney General. and submitted a sample Notice of Data Breach letter ("Notice"), stating: [10]

> **What Happened?** We recently learned that an unknown, unauthorized third party gained access to certain Columbia Bank applications. Upon discovering the incident, we promptly began an internal investigation, worked to secure our systems, and notified law enforcement. We also engaged a forensic security firm to assist with our investigation and ensure the security of our computer systems. The investigation determined that the unauthorized third party accessed certain Columbia Bank applications and information between October 2, 2025, and December 22, 2025.
>
> **What Information Was Involved?** We reviewed the data potentially accessed or acquired by the unauthorized third party to determine if it contained any personal information. Based on the results of our investigation, on March 6, 2026, we completed our review and determined that the data contained some of your personal information, including your <<data elements – e.g., name, Social

[9] Ex. A.

[10] https://oag.ca.gov/ecrime/databreach/reports/sb24-621950 (last visited Apr. 27, 2026).



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

> Security number, driver's license number, and financial account number>>. [11]

23. Defendants' conduct, by acts of commission or omission, caused the Data Breach, including: Defendants' failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard Plaintiff's and Class Members' Private Information, allowing Private Information to be accessed and stolen, and by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, and by failing to adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems, resulting in the Data Breach.

24. As more fully articulated below, Plaintiff's and the proposed Class Members' Private Information was unauthorizedly disclosed to, and actually "exfiltrated by," third-party cybercriminals in the Data Breach, has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse.

### C. Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information

25. As a condition of receiving services from Defendants, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendants.

26. Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiff's and Class Members' Private Information, Defendants would be unable to offer their services.

---

[11] *Id.*



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

27. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

28. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

29. Defendants could have prevented this Data Breach by properly securing, redacting, and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

30. Upon information and belief, Defendants made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information, including through their Privacy Policies[12].

31. Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D. Plaintiff's Experiences**

32. Plaintiff is a former employee of Defendants.

33. Upon information and belief, Plaintiff is a Data Breach victim.

---

[12] https://privacy.columbiabank.com/policies (last visited Apr. 27, 2026) ("We use physical, electronic, and procedural safeguards that comply with federal standards to protect and limit access to personal information. This includes device safeguards and secured files and buildings."); *see also* https://privacy.columbiabank.com/policies?name=u-s-consumer-privacy-notice (last visited Apr. 27, 2026) ("To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. Additionally, we assess current risks to design specific safeguards that protect customer information and have processes in place to deal with information security incidents if they occur.")



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

34. As a condition of receiving employment from Defendants, Plaintiff was required to provide his Private Information to Defendants, including but not limited to his name, Social Security number, driver's license number, and financial account information.

35. Plaintiff typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff has never knowingly transmitted Private Information over the internet or other unsecured sources.

36. Plaintiff stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique passwords for his online accounts.

37. In entrusting his Private Information to Defendants, Plaintiff believed that Defendants would adequately safeguard that information. Had Plaintiff known that Defendants would not utilize reasonable data security measures, Plaintiff would not have entrusted his Private Information to Defendants.

38. As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, researching the Data Breach, and protecting himself from identity theft and fraudulent misuse of his Private Information, disclosed as a result of the Data Breach.

39. After the Data Breach occurred, Plaintiff experienced numerous suspicious log-in attempts to his accounts in March and April of 2026, which interfered with his use of his devices. Additionally, on March 20, 2026, Chase notified Plaintiff that a credit application was attempted in his name. Plaintiff does not have a Chase account, and Plaintiff is actively attempting to resolve this issue with Chase. As a result of the timing of the Data



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Breach and these suspicious activities, Plaintiff believes that the suspicious activities are a result of cybercriminals having acquired his Private Information in the Data Breach.

40. Further, after the Data Breach and in an effort to mitigate the harms caused by the Data Breach, Plaintiff enrolled in (i) Equifax's credit monitoring services, enrolling around January of 2026 and paying approximately $30.00 per month, (ii) Cloaked to remove his information from data broker sites, enrolling around January of 2026 and paying approximately $200.00, and (iii) Dun & Bradstreet's business credit monitoring, enrolling around March 2026 with a free trial, but Plaintiff expects to pay over $500.00 for the service after the trial has lapsed.

41. In addition, because of the Data Breach, Plaintiff also suffered diminution in the value of his Private Information, a form of intangible property he entrusted to Defendants for the sole purpose of obtaining financial services.

42. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information in the Data Breach.

43. He fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety, embarrassment, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

44. Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

45. As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

46. Furthermore, Plaintiff's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the prospect of additional harm.

**E. Defendants Knew or Should Have Known of the Risk of a Cyber Attack Because Financial Service Entities in Possession of Private Information Are Particularly Susceptible to Cyber Attacks**

47. Plaintiff and the proposed Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

48. By failing to do so, Defendants put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

49. Defendants tortiously, or in breach of their implied contracts, failed to take the necessary precautions required to safeguard and protect the Private Information of Plaintiff and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiff and the other Class Members' rights.

50. It is well known that Private Information, including names and Social Security numbers in particular, are invaluable commodities and a frequent target of hackers.

51. Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

52. Data thieves regularly target entities in the financial services industry like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

53. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting financial services entities like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

54. In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, LoanDepot (16.9 million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024), and Prudential Financial (2.5 million affected, February 2024), and in light of the highly-publicized data breaches other companies have suffered as recently as 2024, Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

55. In 2023, a record 3,205 data breaches occurred in the United States, resulting in about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[13] These statistics have held steady for 2024 – when 3,158 data compromises occurred with over 23.3% occurring in the financial services industry.[14] The financial services industry was the most targeted industry for data incidents in 2024.

56. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

57. Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

---

[13] ITRC (Identity Theft Resource Center), *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/

[14] https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Apr. 27, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

58. Private Information is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

59. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name or Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

60. Given the nature of the Data Breach, it was foreseeable that the compromised Private Information could be used by hackers and cybercriminals in a variety of different injurious ways.

**F. Data Breaches Are Preventable**

61. Data breaches are preventable.[15] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[16] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[17]

62. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [18]

---

[15] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[16] *Id.* at 17.

[17] *Id.* at 28.

[18] *Id.*



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

63. Defendants could have prevented this Data Breach by, among other things, properly encrypting, redacting, or otherwise protecting their equipment and computer files containing Private Information.

64. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[19]

65. To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and

[19] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Apr. 27, 2026)



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[20]

66. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates

---

[20] *Id.* at 3-4.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[21]

---

[21] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Apr. 27, 2026)



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

67. Given that Defendants were storing the sensitive Private Information of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

68. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of, upon information and belief, thousands of individuals, including that of Plaintiff and Class Members.

**G. The Value of Private Information**

69. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

70. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[24]

---

[22] 17 C.F.R. § 248.201 (2013).

[23] *Id.*

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Apr. 27, 2026)



McNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

71. For example, Personal Information can be sold at a price ranging from hundreds to thousands of dollars.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

72. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

73. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in the Data Breach, are among the worst kinds of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

74. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and

---

[25] *Here's What Your Data Sells for on the Dark Web*, Experian, June 30, 2025, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Apr. 27, 2026)

[26] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr. 27, 2026)



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

other private information increases." [27] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[28]

75. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[29]

76. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[30] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[31]

77. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[27] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (last visited Apr. 27, 2026)

[28] *Id.*

[29] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Apr. 27, 2026)

[30] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Apr. 27, 2026)

[31] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited Apr. 27, 2026)



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

78. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

79. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

80. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security Numbers.

[32] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Apr. 27, 2026)


McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

81. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

82. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

83. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**H. Defendants Failed to Comply with FTC Guidelines**

84. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

85. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information

---

[33] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Apr. 27, 2026)



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[34]

86. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[35]

87. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88. These FTC enforcement actions include actions against entities failing to safeguard Private Information such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[34] *See* Federal Trade Commission, October 2016, "Protecting Personal Information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last visited Apr. 27, 2026).

[35] *See id.*



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

89. Defendants failed to implement basic data security practices, including practices that are widely employed throughout the financial services industry. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

90. Defendants were at all times fully aware of their obligations to protect Private Information. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**I. Defendants Fail to Comply with Industry Standards.**

91. As shown above, experts studying cyber security routinely identify organizations holding Private Information as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2025, the global average cost of a data breach rose to $5.08 million, which accounts for a nearly 10% increase since 2021.[36]

92. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider

---

[36] IBM, "Cost of a data breach 2025: The AI oversight gap", available at https://www.ibm.com/reports/data-breach (last visited Apr. 27, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Management, Application Software Security, Incident Response Management, and Penetration Testing.[37]

93. In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, such as:

- Control who logs on to your network and uses your computers and other devices.
- Use security software to protect data.
- Encrypt sensitive data, at rest and in transit.
- Conduct regular backups of data.
- Update security software regularly, automating those updates if possible.
- Have formal policies for safely disposing of electronic files and old devices.
- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[38]

94. Upon information and belief, Defendants failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

---

[37] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last visited Apr. 27, 2026)

[38] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last visited Apr. 27, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

### J. Defendants Owed Plaintiff and Class Members a Duty to Safeguard their Private Information

95. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

96. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

97. Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

98. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

99. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

100. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

### K. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

101. Plaintiff and members of the proposed Class have suffered injury and



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

damages from the unauthorized disclosure of their Private Information in the Data Breach that can be directly traced to Defendants' failure to adequately protect that Private Information.

102. As stated prior, in the Data Breach, unauthorized cybercriminals were able to access Plaintiff's and the proposed Class Members' Private Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

103. The ramifications of Defendants' failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

104. Because Defendants collectively failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

a. dissemination of that Private Information, including said information being posted on the Dark Web for fraudulent, criminal activity or sale;

b. fraudulent misuse of Private Information, including fraudulent loans taken out using Private Information acquired in the Data Breach, fraudulent cellular telephone accounts taken out using Private Information acquired in the Data Breach; and, identity theft and impersonation using Private Information acquired in the Data Breach;



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

c. Targeted phishing, malware, and increase in spam emails, texts, and calls which are attempts to acquire further information to be used for fraud and identity theft;

d. The loss of the opportunity to control how their Private Information is used;

e. The diminution in value of their Private Information;

f. The compromise and continuing publication of their Private Information;

g. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

i. Emotional Distress;

j. Delay in receipt of tax refund monies;

k. Unauthorized use of stolen Private Information; and

l. The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

105. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

106. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victims' names; hackers taking over email and other accounts; time and effort to repair credit scores; losing



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victims' social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victims' names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

107. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[39]

108. The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of Plaintiff and Class Members.

109. Identity thieves use stolen Private Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

110. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[40]

---

[39] *See* https://www.identitytheft.gov/Steps (last visited Apr. 27, 2026).

[40] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

111. What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information is a valuable property right.[41]

112. The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that Private Information has considerable market value.

113. It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

114. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

115. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

116. Thus, Plaintiff and the Class Members must vigilantly monitor their accounts for many years to come.

117. Plaintiff's and Class Members' Private Information, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at

---

available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last visited Apr. 27, 2026).

[41] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[42]

118. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity; lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

119. Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and Defendants should have strengthened their data systems accordingly before Plaintiff and the Class Members entrusted them with their Private Information.

### L. Defendants Owed Plaintiff and Class Members a Duty to Safeguard their Private Information

120. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

121. Defendants owed a duty to Plaintiff and Class Members to create and

---

[42] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World, Tim Greene, Feb. 6, 2015, https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Apr. 27, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

122. Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

123. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

124. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

125. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**M. The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft**

126. The unencrypted Private Information of Plaintiff and Class Members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of hackers.

127. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members.

128. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members because of the Data Breach.

129. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

theft related crimes discussed below.

130. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

**N. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

131. As a result of the recognized risk of identity theft, when a data breach occurs and an individual learns that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

132. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

133. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

134. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43]

135. Plaintiff's mitigation efforts are also consistent with the steps the FTC

---

[43] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited April 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

136. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**O. Diminution of Value of Private Information**

137. Private Information is valuable property.[45] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber theft include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

138. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

139. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained,

---

[44] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited April 24, 2026).

[45] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited April 24, 2026) ("GAO Report").



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

"Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[46]

140. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[47]

141. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[48] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[49,50] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[51]

142. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now

---

[46] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited April 24, 2026).

[47] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[48] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited April 24, 2026).

[49] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited April 24, 2026).

[50] https://datacoup.com/ (last visited April 24, 2026).

[51] https://www.thepennyhoarder.com/make-money/nielsen-panel/#:~:text=Sign%20up%20to%20 join%20the,software%20installed%20on%20your%20computer (last visited April 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

143. The fraudulent activity resulting from the Data Breach may not come to light for years.

144. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

145. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to 50,640 individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data52.

146. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**P. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

147. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

---

[52] https://ocrportal.hhs.gov/ocr/breach/breach_report_hip.jsf (last visited April 24, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

148. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

149. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

150. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear, but for Defendants' failure to safeguard their Private Information.

### Q. Loss of the Benefit of the Bargain

151. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants for their services, Plaintiff and other reasonable Class Members understood and expected that they were, in part, paying for the equipment and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

## CLASS ACTION ALLEGATIONS

152. Plaintiff brings this action on behalf of himself, and on behalf of all other persons similarly situated:

> **Nationwide:** All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach, including all who were sent a notice of the Data Breach (the "Class", and all individuals in the Class, the "Class Members").



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

153. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

154. Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

155. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

156. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff and Class Members' Private Information;

b. whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. whether Defendants breached their duty to Class Members to safeguard their



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Private Information;

g. whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h. whether Defendants should have discovered the Data Breach sooner;

i. whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. whether Defendants' conduct was negligent;

k. whether Defendants breached implied contracts with Plaintiff and Class Members;

l. whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m. whether Defendants failed to provide notice of the Data Breach in a timely manner; and

n. whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

157. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

158. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

159. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

single action has important and desirable advantages of judicial economy.

160. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

161. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

162. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. whether Defendants failed to timely notify the public of the Data Breach;
b. whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;
c. whether Defendants' security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;
d. whether Defendants' failure to institute adequate protective security measures amounted to negligence;



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

e. whether Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

f. whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

163. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach.

**<u>COUNT I</u>**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

164. Plaintiff repeats and re-alleges paragraphs 1 through 163 of this Complaint and incorporates them by reference herein.

165. Plaintiff and the Class Members entrusted their Private Information to Defendants.

166. Defendants owed Plaintiff and Class Members a duty to exercise reasonable care in handling and using the Private Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

167. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to adequately safeguard the Private Information in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that Private Information—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties and by failing to properly supervise both



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the way the Private Information was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

168. Defendants owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Private Information. Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

169. Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact due to Defendants' inadequate security protocols. Defendants sought and obtained Plaintiff's and members of the Class's Private Information.

170. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendants hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access their databases containing the Private Information—whether by a sophisticated cyberattack or otherwise.

171. Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

172. Defendants breached their duties by failing to exercise reasonable care in handling and securing the Private Information of Plaintiff and Class Members, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury-



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

in-fact and damages.

173. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

174. As a direct, proximate, and traceable result of Defendants' negligence, Plaintiff has suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

175. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Private Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; loss of the opportunity to control how Private Information is used; diminution in value of their Private Information; compromise and continuing publication of their Private Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Private Information; the continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession; and an increased risk of fraud and identity theft.

176. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

members of the Class's Private Information.

177. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive Private Information.

178. Defendants violated their respective duties under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to Plaintiff and Class Members in the event of a breach, which ultimately came to pass.

179. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class Members.

180. Defendants had a duty to Plaintiff and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's Private Information.

181. Defendants breached their duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Private Information.

182. Defendants' violation of Section 5 of the FTC Act and their failure to comply



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

with applicable laws and regulations constitute negligence *per se*.

183. As a result of the negligence of Defendants, Plaintiff and the Class Members are entitled to recover actual, compensatory, and punitive damages.

184. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) properly notify affected victims of the Data Breach (ii) strengthen their data security systems and monitoring procedures; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) provide adequate credit monitoring to all Class Members.

185. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the exposure of the Private Information of Plaintiff and the Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

186. Plaintiff repeats and re-alleges paragraphs 1 through 163 of this Complaint and incorporates them by reference herein.

187. Defendants offered to provide services to Plaintiff and the Class Members in exchange for their Private Information and in exchange for amounts paid for services that included payment for data security.

188. Plaintiff and the Class Members accepted Defendants' offer by providing Private Information to Defendants, in exchange for financial services.

189. In turn, and through internal policies described in the preceding paragraphs, and other conduct and representations, Defendants agreed they would not disclose the



McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Private Information they collect to unauthorized persons and that they would safeguard the Private Information.

190. Implicit in the parties' agreement was that Defendants would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

191. Plaintiff and the Class Members would not have entrusted their Private Information to Defendants in the absence of such an agreement.

192. Defendants materially breached the contracts they had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, and by failing to notify Plaintiff and Class Members promptly of the Data Breach. Defendants further breached the implied contracts with Plaintiff and the Class Members by:

a. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

b. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendants created, received, maintained, and transmitted.

193. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of their agreements.

194. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

195. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

substance of their contract in addition to its form.

196. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

197. Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

198. In these and other ways, Defendants violated their duties of good faith and fair dealing.

199. Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

200. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the proposed Class Members are entitled to actual, compensatory, and consequential damages.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

201. Plaintiff repeats and re-alleges paragraphs 1 through 163 of this Complaint and incorporates them by reference herein.

202. This claim is pleaded as an alternative to the breach of implied contractual duty claim.

203. Plaintiff and Class Members conferred a benefit upon Defendants in the form of monies paid for Defendants' services and their Private Information.

204. Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiff and the Class Members.

205. As a result of Defendants' conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in value between the purchases



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

made with reasonable data privacy and security practices and procedures that Plaintiff and the Class Members paid for, and the purchases without reasonable data privacy and security practices and procedures that they received.

206. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff and the proposed Class Members' payments and their Private Information, because Defendants failed to adequately protect the Private Information. Plaintiff and the Class Members would not have provided their Private Information, nor used and paid for Defendants' services, had they known Defendants would not adequately protect their Private Information.

207. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and the Data Breach alleged herein.

**COUNT IV**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**RCW §§ 19.86.010, *et seq.***
**(On Behalf of Plaintiff and the Class)**

208. Plaintiff repeats and re-alleges paragraphs 1 through 163 of this Complaint and incorporates them by reference herein.

209. Defendants, each, are a "person," as defined by RCW 19.86.010(1).

210. Defendants advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by RCW 19.86.010(2).

211. Defendants engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of RCW 19.86.020, including:

a. By failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the data breach;



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information.

212. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of the Private Information.

213. Defendants' conduct is injurious to the public interest, including the thousands of Washingtonians affected by the Data Breach.

214. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages,



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and their Private Information's loss of value.

215. Plaintiff and Class Members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated, requests that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the Class;

B. Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting such other or further relief as may be appropriate under the circumstances.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED this 28th day of April, 2026.

McNAUL EBEL PLLC

By: *s/ Kaleigh N. Boyd*

Kaleigh N. Boyd, WSBA No. 52684
600 University Street, Suite 2700
Seattle, Washington 98101
Phone: (206) 467-1816
Fax: (206) 624-5128
Email: kboyd@mcnaul.com

Leanna A. Loginov
(*pro hac vice* forthcoming)
SHAMIS & GENTILE, P.A.
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479.2299
Email: lloginov@shamisgentile.com

*Attorneys for Plaintiff and Proposed Class Counsel*